**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MICHELE POLITTE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:12 CV 2100 AGF / DDN |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Michele Politte for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the decision of the Administrative Law Judge should be reversed and remanded for further proceedings.

## I. BACKGROUND

Plaintiff Michele Politte, born July 9, 1968, applied for Title XVI benefits on August 15, 2006. (Tr. 71-73.) She alleged an onset date of disability of October 1, 2002, later amended to September 28, 2005, due to bipolar disorder and major depressive

_____

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

disorder.  (Tr. 81, 86-94.)  Plaintiff's application for Title XVI benefits was denied initially on September 25, 2006, and she requested a hearing before an ALJ.  (Tr. 43-48.)

On September 15, 2008, following a hearing, the ALJ found plaintiff not disabled. (Tr. 8-15.)  On February 26, 2009, the Appeals Council denied plaintiff's request for review, and she appealed to the district court.  (Tr. 1-4.)  On September 29, 2010, the district court reversed the Commissioner's decision and remanded the case for further proceedings.  (Tr. 386-404.)

On March 29, 2012, following a second hearing, the ALJ again found plaintiff not disabled.  (Tr. 369-81.)  On September 13, 2012, the Appeals Council denied plaintiff's request for review due.  (Tr. 363-65.)  Thus, the second decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On September 18, 2005, plaintiff was admitted to the Metropolitan St. Louis Psychiatric Center on transfer from a nearby hospital, complaining of depression.  The attending psychiatrist, Muhammad Baber, M.D., noted that plaintiff had chronic depressive symptoms and had received diagnoses of borderline personality disorder, mood disorders, or at other times diagnosed with mood disorder.  He noted her history of cocaine and marijuana use.  She stated that she last used cocaine over a year ago but tested positive for cocaine.  Plaintiff stated that she occasionally took Prozac, Mellaril, Paxil, and Trazodone.[2]  She told Dr. Baber that she had occasional suicidal thoughts but no active suicidal intent or plan.  She also had decreased concentration in memory and felt hopeless,

---

[2]  Prozac is a brand of fluoxetine, used to treat depression, panic attacks, and obsessive compulsive disorder.  WebMD, http://www.webmd.com/drugs (last visited on September 20, 2013).  Mellaril is a brand of thioridazine, used to treat certain mental/mood disorders. Id.  Paxil is used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and post-traumatic stress disorder.  Id.  Trazodone is used to treat depression. Id.

helpless, and worthless. She suffered decreased energy, crying spells, and difficulty sleeping. She reported sexual abuse by her cousin and a neighborhood boy as a child but denied nightmares or flashbacks. Dr. Baber noted that plaintiff suffered asthma and Turner's syndrome.[3] He diagnosed cannabis dependence, cocaine abuse, mood disorder, and borderline personality disorder. On admission, Dr. Baber noted that plaintiff had a Global Assessment of Functioning (GAF) score of 35 to 40.[4] When discharged on September 21, 2005, Dr. Baber gave a GAF score of 60 and prescribed Prozac and trazodone.[5] (Tr. 130-41.)

On September 28, 2005, plaintiff met with Syed Raza, M.D., who diagnosed plaintiff with bipolar disorder, cannabis dependence, cocaine abuse, and Turner syndrome and considered personality disorder. She stated that she smoked marijuana continuously to control her mood and concentration. She reported that she attempted suicide by cutting

---

[3] Turner syndrome is a rare chromosomal disorder in females characterized by short stature and the lack of sexual development at puberty. WebMD, http://www.children.webmd.com/turner-syndrome (last visited on September 20, 2013).

[4] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000) ("DSM").
    A GAF of 31 through 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work). Id.

[5] On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). DSM at 32-34.

at age seventeen. He noted that she planned to obtain a GED and work as a cosmetologist. Dr. Raza prescribed Prozac and Seroquel.[6] (Tr. 303-04.)

On November 23, 2005, plaintiff visited Dr. Raza for a follow-up appointment. Plaintiff reported a cheerful mood and that she felt better. She also reported continued difficulty obtaining employment but that she had experience in retail, factories, and gas stations. (Tr. 305.)

On January 18, 2006, she reported that she continued to search for fulltime employment but that she obtained temporary work. She also reported that she last used drugs prior to September 2005. Dr. Raza noted that Prozac stabilized her mood and eliminated depression and that Seroquel allowed her to sleep. Plaintiff inquired as to whether she should continue Prozac if pregnant, and Dr. Raza advised her to obtain a pregnancy test. (Tr. 306.)

On January 21, 2006, plaintiff arrived at the emergency room and complained of abdominal pain. Christopher J. Richter, M.D., diagnosed left lower quadrant abdominal pain and prescribed Percocet. (Tr. 235-47.)

On March 15, 2006, plaintiff did not show up for her appointment with Dr. Raza. (Tr. 307.)

On April 22, 2006, plaintiff arrived at the emergency room and reported a plan to commit suicide by drug overdose. She reported depression over the previous few days due to stress relating to family, money, employment, and abstention from drug use and had attempted suicide a few months ago. Jeff Vander Kooi, M.D., performed a psychiatric consultation and assessed borderline personality disorder, marijuana abuse, and a GAF score of 55. He provided plaintiff with treatment options, including outpatient treatment. He noted plaintiff's acquiescence with the treatment plan and that she felt

---

[6]   Seroquel is a brand of quetiapine, used to treat certain mental/mood conditions. WebMD, http://www.webmd.com/drugs (last visited on September 20, 2013).

- 4 -

hopeful for the future.  Donald D. Miller, M.D. diagnosed acute depression and discharged plaintiff.  (Tr. 169-79.)

On May 19, 2006, Soraya D. Asadi, M.D., examined plaintiff who reported the following.  Plaintiff had difficulty with attention in school, her school placed her into a special education program from third to twelfth grade, and she left school before graduating.  Plaintiff was hospitalized around 1993 after learning of her husband's adultery and took Depakote, Mellaril, and thorazine for her mental condition, which did not improve her condition.  She received a diagnosis of bipolar disorder but could no longer afford psychiatric care after her divorce.  She also underwent a one-week hospitalization around 1996 for difficulty concentrating and racing thoughts.  She took Depakote but could no longer afford psychiatric care after a second divorce.  Subsequently, she saw a counselor for some time, which she found helpful.  She underwent another hospitalization in 1998 for alcohol, cocaine, and cannabis dependence and informing medical staff that she would commit suicide without immediate alcohol and drug treatment.  Depakote caused liver problems.  She also took Prozac, which improved her mood.  After moving, she sought help at the Crider Center for some time but discontinued due to difficulty obtaining a caseworker and the limited duration of her appointments.  She found Seroquel ineffective and that it caused excessive drowsiness.  She took no medication during the past four months.  Recently, she underwent two or three hospitalizations for her usual depressive symptoms.  She once attempted suicide by overdose but induced vomiting.  Her most significant mental problems include distractibility and memory.  Her goal is to obtain a GED to attain employment and financial independence.  Dr. Asadi stated that plaintiff began heavy drug and alcohol use as a teenager, which continued into adulthood and that records indicated that she remained married in 1998.  (Tr. 164-65.)

Plaintiff further reported two paternal aunts who suffered depression.  Although she does not get along with her brother, she remains close with her mother with whom she

currently resides. Dr. Asadi noted that records indicated that plaintiff had been placed on probation. She reported working multiple jobs, including cashier, factory worker, and a position at Wal-Mart. Boredom and the feeling that people watch her cause her difficulty in maintaining employment. (Tr. 166.)

Dr. Asadi noted that plaintiff had moderately pressured speech and tangential flow of thought that could be redirected. She also noted that plaintiff had a tendency to punctuate her speech with unprovoked bouts of laughter. Dr. Asadi opined that plaintiff's marijuana use may have impaired her concentration but found her difficulty with memory and attention consistent with Turner syndrome. She also suspected that plaintiff feigned inability to remember but also found it consistent with mental retardation caused by Turner syndrome. She told plaintiff to return to the clinic in one month. (Tr. 162-68.) Dr. Asadi assessed moderate, recurrent major depressive disorder, cocaine dependence in full sustained remission, active cannabis dependence, alcohol dependence in full sustained remission, borderline personality disorder, Turner syndrome, and probable mental retardation. She continued plaintiff on Prozac and evaluated plaintiff's GAF at approximately 50.[7] She also recommended Alcoholics Anonymous or Narcotics Anonymous and a basic metabolic profile and that she obtain primary care for hormone replacement therapy and bone health related to Turner syndrome. (Tr. 164, 167-68.)

On June 20, 2006, plaintiff arrived at the emergency room after ingesting 12-16 Seroquel tablets. Plaintiff stated that she had increasing amounts of stress and depressive episodes and indicated hopelessness, helplessness, overwhelming depression, and borderline bipolar disorder. Drug screening indicated cocaine use. Felipe Orellana, M.D., admitted plaintiff for a psychiatric inpatient stay. (Tr. 199-216, 229-34.)

_____

[7]  A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM at 32-34.

On June 21, 2006, plaintiff transferred to Barnes-Jewish St. Louis Hospital Psychiatric Department for treatment. On admission, Diane T. Howard, MSW, assessed bipolar disorder II and a GAF score of 20.[8] Plaintiff stated that she took the Seroquel to get the attention of her mother after her mother told her that she had to move from her home due to lack of employment. She reported heavy cocaine use during the previous weekend. She mentioned attempts at seeking psychiatric care but that the Crider Center denied her due to lack of insurance. She also expressed dissatisfaction with the psychiatrist and lack of caseworker at the Crider Center. She expressed interest in obtaining Medicaid. She also mentioned that lack of transportation impeded her efforts to obtain a GED and become a cosmetologist. She reported that enjoyed reading, walking, and riding horses with her group of friends. She also reported smoking a pack of cigarettes per day since age sixteen and using marijuana "as often as [she] can." She indicated that petty theft was the basis of her probation. Richard W. Hudgens, M.D. prescribed Lamictal for mood stabilization. On June 23, 2013, Dr. Hudgens discharged plaintiff and diagnosed bipolar affective disorder type II, cannabis abuse, cocaine abuse, history of alcohol dependence, and history of borderline personality disorder. Throughout the course of the hospital stay, she persistently denied that she attempted to commit suicide. (Tr. 250-91.)

On July 19, 2006, plaintiff saw Dr. Raza. Plaintiff stated that she had not been pregnant. Dr. Raza noted that plaintiff had very disturbed sleep rhythm and occasionally heard voices. He also noted plaintiff's high caffeine intake. He observed an inappropriately happy mood, inappropriate affect, and that plaintiff spoke loudly. He diagnosed the manic phase of bipolar I disorder and prescribed Fluoxetine, Lamictal, and Trazodone. (Tr. 308.)

---

[8] A GAF of 11 through 20 is characterized by some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g. largely incoherent or mute). DSM at 32-34.

On August 9, 2006, plaintiff stated that her mood was more stable but that her ex-boyfriend's reappearance upset her. She denied hearing voices and stated that Trazodone allowed her to sleep. Dr. Raza observed inappropriate happiness, unstable mood, and talkativeness. (Tr. 309.)

On September 6, 2006, plaintiff did not attend her scheduled appointment with Dr. Raza. (Tr. 335.)

On September 22, 2006, R. Cottone, submitted a Psychiatric Review Technique form regarding plaintiff. He found that she suffered from bipolar disorder, intense and unstable personal relationships, impulsive and damaging behavior, and behavioral or physical changes as a result of substance use. He determined that plaintiff suffered marked limitations in maintaining social functioning and moderate limitations in activities of daily living and maintaining concentration, persistence, or pace. He also found that plaintiff suffered one or two episodes of decompensation, each of extended duration.[9] Cottone did not conclusively find plaintiff free of substance abuse. He also noted that her mental condition prevented public contact work. (Tr. 310-21.)

On September 22, 2006, Cottone also submitted a Mental Residual Functional Capacity Assessment form. He determined that plaintiff had marked limitation with (a) the ability to understand and remember detailed instructions and (b) the ability to carry out detailed instructions; and that plaintiff was moderately limited in other areas of sustained concentration and persistence. He found marked limitations in her ability to interact appropriately with the general public and moderately limited in other areas of social interaction. He also found moderate limitation with the ability to set realistic goals and independent planning. Dr. Cottone concluded that plaintiff should avoid work involving extensive interaction with others, including handling complaints or dissatisfied customers, close proximity to coworkers, or any public contact. He further concluded that plaintiff should avoid close proximity to controlled substances. He also concluded that

_____

[9] An episode of decompensation is a temporary increase in symptoms or signs accompanied by a loss of adaptive functioning. (Tr. 328.)

plaintiff could understand, remember, carry out and persist at simple tasks, make simple work-related judgments, relate adequately to coworkers or supervisors, and adjust adequately to ordinary changes in work routine or setting. (Tr. 322-24.)

On October 11, 2006, Dr. Raza noted that plaintiff had exhausted her medication supply as a result of missing her last appointment. Plaintiff complained that her mood swings continued and she did not connect with her current case manager. Dr. Raza observed inappropriate happiness and frequent laughter. He increased her Lamictal dosage. (Tr. 334.)

On November 8, 2006, Dr. Raza submitted a Mental Medical Source Statement form. He found marked limitations with the ability to behave in an emotionally stable manner and to maintain reliability, and moderate limitations with other activities of daily living. He found marked limitations in her ability to relate in social situations and maintain socially acceptable behavior, and moderate limitations with other areas of social functioning. He found marked limitations with her ability to complete a normal workday and workweek without interruptions from symptoms and maintain attention and concentration for extended periods, and moderate to mild limitations with the other areas of concentration, persistence, and pace. He noted that plaintiff experienced an episode of decompensation during July 2006 and had a substantial loss of the ability to make simple work-related decisions, to respond appropriately to usual work situations, and to deal with changes in the work setting. He diagnosed plaintiff with bipolar I disorder, cannabis dependence, and cocaine abuse; he noted she presented an inappropriate affect and mood and he believed that she intermittently hears voices. He further described her response to treatment as erratic. He assessed a current GAF score of 65 but noted that her lowest GAF score during the past year was in the 50s.[10] (Tr. 326-29.)

---

[10] A GAF score of 61-70 is characterized by some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning with some meaningful interpersonal relationships. <u>DSM</u> at 32-34.

On November 15, 2006, plaintiff complained of hypomania that she attributed to Lamictal and reported that she had stopped taking Lamictal three weeks earlier.  Dr. Raza noted that plaintiff appeared alert, oriented, and talkative, in a happy mood, with frequent laughter, and that she was not psychotic.  He decreased her Prozac dosage.  (Tr. 333.)

On January 10 and January 31, 2007, plaintiff did not attend her appointments with Dr. Raza.  (Tr. 331-32.)

On March 28, 2007, Dr. Raza noted the denial of plaintiff's application for social security benefits but that she had counsel.  He stated that plaintiff's regimen of Lactimal and decreased Prozac resulted in an improved condition.  She reported no sleeping difficulties.  He observed that plaintiff was loud, alert, oriented, coherent, relevant, and rational, and had engaged in laughter.  He diagnosed her with bipolar I disorder and cocaine dependence.  (Tr. 347.)

On June 27, 2007, Dr. Raza noted that plaintiff had previously failed to attend three appointments due to lack of transportation.  Plaintiff stated that she last used cocaine six months ago and had not attended any meetings.  Dr. Raza diagnosed bipolar I disorder, and cocaine dependency.  (Tr. 346.)

On August 22, 2007, plaintiff described herself as a "ball of energy," and her mother described plaintiff as "hyped up."  Plaintiff told Dr. Raza that she had not used cocaine in almost a year.  Dr. Raza observed that plaintiff may be hearing.  He described her as alert, oriented, loud, coherent, relevant, and rational.  He increased her Lamictal dosage.  (Tr. 345.)

On October 10, 2007, plaintiff reported that her Medicaid had not been renewed but that she had reapplied with Dr. Raza's recommendation.  She exhausted her supply of Invega one week earlier. [11]  She could not provide the date of her last cocaine use.  (Tr. 352.)

---

[11]  Invega is a brand of paliperidone, an atypical antipsychotic used to treat certain mental/mood disorders by decreasing hallucinations.  WebMD, http://www.webmd.com/drugs (last visited on September 20, 2013).

On November 7, 2011, plaintiff reported anxiety and impatience. Dr. Raza increased plaintiff's Invega dosage. Plaintiff reported hyperactivity and daily headaches. (Tr. 351.)

On April 9, 2008, Dr. Raza noted plaintiff's failure to attend an appointment due to lack of transportation. She reported abstinence from cocaine use for over a year and satisfaction with her medication regimen. She reported that she slept well, had no problems with her appetite, spent her free time reading, and helped her friend move. Dr. Raza observed loud laughter and good eye contact and described plaintiff as coherent, relevant, and rational. He diagnosed her with bipolar I disorder and cocaine dependence. (Tr. 350.)

On June 4, 2008, plaintiff complained that she felt tired. She reported that she would get her driver's license back in one month and that she continued to reside with her mother. (Tr. 349.)

On July 16, 2008, Dr. Raza submitted a Mental Medical Source Statement form. Dr. Raza found marked limitations with the ability to function independently, behave in an emotionally stable manner, and to maintain reliability. He found marked limitations with the ability to relate in social situations, interact with the general public, accept instructions and respond to criticism, and maintain socially acceptable behavior. He found marked limitations with her ability to complete a normal workday and workweek without interruptions from symptoms, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of rest periods, sustain an ordinary routine without special supervision, respond to changes in the work setting, and work in coordination with others. He noted that she suffered one to two periods of decompensation in the past year that lasted at least two weeks. He also indicated that plaintiff had substantial loss of the ability to make judgment commensurate with the functions of unskilled work, to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting. He

indicated that plaintiff has suffered limitations since her teen years. He opined that plaintiff had suffered from bipolar I disorder that caused psychotic thought process, impulsive behavior, and severely impaired judgment. He assessed a current GAF score of 65 but that her lowest score during the past year was in the 50s and noted occasional inappropriate mood and affect, impaired insight, and uneven response to treatment. (Tr. 355-58.)

On July 16, 2008, Dr. Raza also submitted a Medical Source Statement Concerning Drug Abuse and Alcoholism form. He indicated that plaintiff had a cocaine substance abuse disorder but had not used for one year. He opined that drug use did not cause her functional limitations but exacerbated them. He noted that her functional limitations would not substantially improve without drug use and that substantially similar limitations would remain. He noted the unpredictable nature of bipolar I disorder even with treatment compliance. (Tr. 359.)

On April 26, 2008, the Social Security Administration requested clarification of Dr. Raza's medical source statements. On September 3, 2008, Dr. Raza responded that he had treated plaintiff since September 2005. Dr. Raza explained the inexactitude of psychiatry and that he based his findings on his observations of plaintiff. He stated that her GAF scores of 60-70 could plummet to 30-40 in days and that plaintiff's actions oscillated between normal and enjoyable interaction and interactions involving inappropriate laughter, loud speech, and hearing voices. He opined that plaintiff's condition appears normal in between episodes but unpredictably changes into psychotic depression or mania where her functioning decreases, rendering her unable to work, even with treatment compliance. He found the use of alcohol and drug use as self-treatment being consistent with mood disorder. He opined she has always been undisciplined and erratic and that failure to comply with her medication regimen, missing appointments, and drug use have exacerbated her condition. (Tr. 360-62.)

On September 24, 2008, Dr. Raza noted that plaintiff failed to attend her August appointment and that plaintiff did not adhere to her medication regimen. Plaintiff complained of weight gain. He diagnosed bipolar I disorder and cocaine dependence but noted that she had not used for over one year. He prescribed Lamictal and Abilify and discontinued Invega.[12] (Tr. 596.)

On November 19, 2008, plaintiff reported extreme stress because the social security office had not received medical records sent by Crider Health Center and became intensely emotional and cried. She reported poor sleep, that her brain did not stop, and occasionally hearing voices. He diagnosed her with bipolar I disorder, cocaine dependence, and Turner syndrome. He prescribed her Lamictal, Abilify, Trazodone, and Buspar.[13] (Tr. 597.)

On February 18, 2009, plaintiff expressed annoyance due to denial of social security benefits. She mentioned that she had not felt well for the past few days due to a urinary tract infection. (Tr. 598.)

On April 21, 2009, plaintiff arrived at the emergency room and complaining of pain near her navel. Peter M. Gardiner, M.D., diagnosed an umbilical hernia. On May 7, 2009, Kenneth Hacker, M.D., performed surgery to repair the hernia. (Tr. 612-18.)

On August 5, 2009, Dr. Raza noted that plaintiff failed to attend her May, June, and July appointments due to lack of a driver license as a result of unpaid fines. She requested medication to alleviate her snappiness and irritability and reported that she had taken no medication for one month. (Tr. 599.)

On October 3, 2009, plaintiff reported hearing voices and being irritable during the past two weeks. She reported drinking half a pot of coffee daily but denied cocaine or

---

[12]   Abilify is a brand of aripiprazole, an antipsychotic drug used to treat certain mental/mood disorders by decreasing hallucinations and improving concentration. WebMD, http://www.webmd.com/drugs (last visited on September 20, 2013).

[13]   Buspar is a brand of buspirone, used to treat anxiety. WebMD, http://www.webmd.com/drugs (last visited on September 20, 2013).

marijuana use. Dr. Raza observed irrelevant talk, inappropriate laughter, and loud speech. He increased her Abilify dosage. (Tr. 600.)

On December 16, 2009, plaintiff reported that she fell on her right shoulder while reaching into her closet. The injury impaired movement, and she planned to receive X-rays. She indicated that she no longer heard voices and had reduced her caffeine intake. (Tr. 601.)

On February 24, 2010, Dr. Raza noted that plaintiff had developed a bony nodule in her mouth that caused sinus problems and headaches. She reported sleeping four to six hours per night and caffeine withdrawal headaches. She also reported recovery from her shoulder injury except for an occasional twinge of pain. (Tr. 602.)

On May 19, 2010, plaintiff reported that she slept all day and remained awake all night reading or browsing the internet. She also complained of weight gain. (Tr. 603.)

On August 18, 2010, plaintiff saw Dr. Raza and reported improved sleeping habits and normal appetite. (Tr. 604.)

On March 30, 2011, plaintiff met with Dr. Raza and reported that she slept well and had good appetite. She also expressed satisfaction regarding her appeal for social security benefits. (Tr. 605.)

On June 22, 2011, plaintiff reported frequent mood swings and worry about her social security application. Dr. Raza observed loud, excessive talking but found her not psychotic. (Tr. 606.)

On December 16, 2011, plaintiff met with Dr. Reising for an initial psychiatric evaluation. Plaintiff reported inability to cope with her joint pain and that she can be very irritable and explosive. She reported that Xanax received from a friend alleviated the pain but that her rheumatologist refused to prescribe the requested pain medication. She further reported difficulty with medication compliance and her attempts to obtain social

security benefits.  She also reported taking gabapentin and cyclobenzaprine.[14]  Dr. Reising noted decrease in sleep, talkativeness, and racing thoughts.  Dr. Reising also noted that plaintiff presented with good eye contact, appropriate behavior, loud speech, and no auditory hallucination; Dr. Raza diagnosed plaintiff with bipolar I disorder and cocaine dependence in remission.  (Tr. 608-11.)

**First ALJ Hearing**

The ALJ conducted a hearing on August 26, 2008.  (Tr. 21-38.)  Plaintiff testified to the following.  She is age forty.  She completed the eleventh grade but did not obtain her GED or take any college courses.  She took a GED course but could not concentrate due to the lack of a one-on-one environment.  She has used cocaine, beginning at age 26 or 27, and marijuana, beginning at about age 20, and but has not used either for over one year.  (Tr. 23-25.)

Her driver's license is suspended due to a traffic ticket and an unpaid fine.  She received the ticket for parking in a fire lane after pulling into a gas station to use the restroom.  Exhaustion of her medication supply due to missing appointments causes her lack of compliance with her medication regimen.  She visits the Crider Clinic in Wentzville to see Dr. Raza, a psychiatrist, for medication every two months.  She also meets with a caseworker.  Her medication stabilizes her mood, focuses her concentration, and prevents her from hearing voices.  Occasionally, she hears voices even with medication.  Her medication also does not prevent manic episodes, and, frequently, she cannot concentrate.  During her manic episodes, she sleeps for only two or three hours. (Tr. 25-27, 29-30.)

She has no children and lives with her mother.  She occasionally works for the DEA.  In July 2008, she worked at The Kitchens in St. Charles through the St. Charles

---

[14] Gabapentin is used with other medications to prevent and control seizures.  WebMD, http://www.webmd.com/drugs (last visited on September 20, 2013).  Cyclobenzaprine is used short-term to treat muscle spasms.  Id.

County DEA office to investigate rumors of drug trafficking. The DEA sent her to investigate the rumor for about two and a half weeks. The DEA began assigning her work as a result of her recording a conversation with a local vandal at the request of the DEA. Before 2000, she received probation for possession of stolen property. (Tr. 27-28.)

She launders, unloads the dishwasher, assists her mother with preparing dinner, and prepares herself meals. Lack of concentration sometimes impedes her performance of household tasks. She shopped for groceries alone when she had transportation but usually shops with her mother. She prefers to shop at night due to fewer customers, which distract her. (Tr. 30-32.)

Her work in fast food required her to lift only five to ten pounds. Her work as a gas station attendant required her to lift only ten pounds. Her work as a telemarketer did not require her to lift at all. In 1995, she intermittently performed factory work for a temp agency. (Tr. 32-33.)

Vocational expert (VE) Vincent Stock also testified at the hearing. The ALJ presented a hypothetical individual of plaintiff's age, education, and work experience. The hypothetical individual could understand, remember, and perform at least simple instructions and non-detailed tasks, demonstrate adequate judgment to make simple work-related decisions, respond appropriately to supervisors and coworkers in a task-oriented setting with casual and infrequent contact with others, adapt to routine, simple work changes but cannot work in a setting with regular contact with the general public, handle more than infrequent customer complaints, or work in a setting with access to controlled substances. (Tr. 33-34.) The VE responded that such individual could perform as a housekeeper, which is light, unskilled work with 480,000 positions nationally, 12,000 positions in Missouri, and 2,000 positions in the St. Louis area; and as a packer/mailer, which is light, unskilled work with 240,000 positions nationally, 6,000 positions in Missouri, and 1,000 positions in the St. Louis area. (Tr. 34-35.)

The ALJ presented a second hypothetical individual with plaintiff's impairments as indicated by Dr. Raza's medical source statement dated July 16, 2008. The VE found the impairments and a GAF score inconsistent. He responded that, ignoring the GAF score, such individual could perform no work. He also stated that, looking only to the GAF, such individual could work. (Tr. 35.)

Plaintiff's counsel described a hypothetical individual of plaintiff's age, education and experience with marked limitations with the ability to maintain reliability and complete a normal workday and work week without interruption from symptoms. The VE replied that such individual would have significant difficulty maintaining fulltime employment. (Tr. 36-37.)

**First Decision of the ALJ**

On September 15, 2008, the ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels, could understand, remember, and perform at least simple instructions and undetailed tasks, demonstrate adequate judgment to make simple work-related decisions, respond appropriately to supervisors and coworkers in task-oriented settings with infrequent and casual contact with others, should not work in settings with access to controlled substances or regular contact with the general public, and should not perform work with more than infrequent handling of customer complaints. (Tr. 11-12.) The ALJ found plaintiff not disabled. (Tr. 15.)

Plaintiff appealed the decision to the district court, arguing that substantial evidence did not support the RFC determination. The district court stated, "the ALJ credited the RFC assessment of Dr. Cottone, a non-examining consulting psychologist, over that of Dr. Raza, Plaintiff's treating psychiatrist," and found that medical evidence did not better support Dr. Cottone's findings nor were Dr. Raza's opinions inconsistent with his treatment notes. The district court also took issue with the ALJ's description of Dr. Raza's treatment notes as "relatively unremarkable" and the ALJ's reliance on lack of

compliance with medication, considering the nature of plaintiff's condition. The district court concluded that substantial evidence did not support the ALJ's determination, reversed the decision and remanded to the ALJ for further proceedings. (Tr. 11-15, 401-04.)

**Second ALJ Hearing**

The ALJ conducted a hearing on January 11, 2012. (Tr. 418-34.) Plaintiff testified to the following. In September of 2011, plaintiff began receiving care from a rheumatologist. The rheumatologist opined that plaintiff suffered fibromyalgia. The ALJ requested that the rheumatologist document her examinations more thoroughly. (Tr. 420-22.)

Plaintiff has not used cocaine since 1996 or 1997. She recently began seeing a new psychiatrist. She has pain and numbness in her neck, shoulders, elbows, hands, fingers, wrists, hips, knees, and feet on a daily basis. On a bad day, she sits in a chair and stares at the television or lays in bed. On a good day, fibromyalgia prevents her from certain activities. The pain is worse upon awakening and at night. Muscle relaxers cause fatigue. Her doctor plans to perform an ultrasound on her hands to observe her joints. Once every two or three weeks, her hands redden and swell, and she cannot use them. She visited the hospital three times for pain caused by fibromyalgia. The first hospital visit occurred at the beginning of December. (Tr. 425-28.)

She measures five foot, three inches and 160 pounds. She took a single Valium pill from her friend without a prescription. She cannot bear children due to Turner syndrome and lives with her mother. (Tr. 429.)

Vocational expert (VE) Delores Gonzales also testified at the hearing. The ALJ presented a hypothetical individual with plaintiff's age, three years of college, and no past relevant work. The hypothetical individual can perform light work, understand, remember, and perform at least simple instructions for non-detailed tasks, demonstrate

adequate judgment to make simple work-related decisions, respond appropriately to supervisors and coworkers in task-oriented settings with infrequent, casual contact with others, should not work in settings with regular contact with the general public or with access to controlled substances, and should not perform work that requires more than infrequent handling of customer complaints. The VE responded that such individual could perform work as a housekeeping cleaner, which is light, unskilled work with 887,890 positions nationally and 21,760 positions in Missouri. (Tr. 430-31.)

The ALJ presented a second hypothetical individual with plaintiff's impairments as indicated by Dr. Raza's medical source statement dated July 16, 2008. The VE stated that such individual could perform no work. (Tr. 431-32.)

Plaintiff's counsel also presented a hypothetical individual with plaintiff's age, education, and experience, limited to light work and requiring two additional randomly occurring fifteen-minute breaks. The VE responded that such individual could perform no work. Plaintiff's counsel altered the hypothetical individual by removing the break requirement but adding that the individual would consistently miss two days per month. The VE responded that such individual could perform no work. (Tr. 432.)

## III. SECOND DECISION OF THE ALJ

On March 29, 2012, the ALJ found plaintiff not disabled. (Tr. 369-81.) At Step One of the prescribed regulatory decision-making scheme,[15] the ALJ found that plaintiff had not engaged in substantial gainful activity since the application date, July 24, 2006. At Step Two, the ALJ found that plaintiff's severe impairments were degenerative changes of the left hand, degenerative disc disease of the lumbar spine, degenerative disc disease and degenerative joint disease of the spine, osteoarthritis of the right great toe, bipolar disorder, and a history of polysubstance abuse in reported remission. (Tr. 371.)

---

[15] See below for explanation.

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 376.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work and can understand, remember and carry out at least simple instructions and non-detailed tasks, demonstrate adequate judgment to make simple work-related decisions, and respond appropriately to supervisors and coworkers in a task-oriented setting with infrequent and casual contact. The ALJ further found that plaintiff should not work in a setting with regular contact with the general public or more than infrequent handling of customer complaints or work in close proximity to alcohol or controlled substances. At Step Four, the ALJ found that plaintiff had no past relevant work. (Tr. 377-79.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 379-80.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by (1) failing to afford more weight to the opinions of Dr. Raza, and (2) failing to explain the weight afforded to opinions of Dr. Cottone. "[A] treating physician is normally entitled to great weight." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders

inconsistent opinions that undermine the credibility of such opinions." Id. The ALJ
should consider each of the following factors in evaluating medical opinions: (1) the
length of the treatment relationship; (2) the nature and extent of the treatment relationship;
(3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion
with the record as a whole; (5) whether the treating physician is also a specialist; and (6)
any other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c)(1. "It is
permissible for an ALJ to discount an opinion of a treating physician that is inconsistent
with the physician's clinical treatment notes." Davidson v. Astrue, 578 F.3d 838, 843 (8th
Cir. 2009).

The ALJ afforded Dr. Raza's opinions little weight. (Tr. 378.) The ALJ
discounted the opinions due to the facial inconsistency of the opinions regarding the GAF
score of 65 and the severe conditions indicated by Dr. Raza. (Id.) The ALJ reasoned that
despite the nature of plaintiff's mood swings, drug use magnified her condition. (Id.) The
ALJ also noted inconsistencies with plaintiff's reported drug use and that plaintiff failed to
comply with her treatment regimen. (Tr. 378-79.) He noted that Dr. Raza described
plaintiff as alert, oriented, coherent, relevant, and rational. (Tr. 379.) The ALJ also stated
that check-off forms are entitled to little weight in the absence of clinical tests, findings, or
treatment notes indicating significant limitations. (Id.)

Substantial evidence does not support the ALJ's decision to afford Dr. Raza's
opinions little weight. First of all, the ALJ's decision begins its narrative discussion of Dr.
Raza's reports with those dated July 2006 and after. (Tr. 371, 372.) The ALJ's decision
does not similarly describe the reports of plaintiff's visits with Dr. Raza on September 28
and November 23, 2005, and January 18, 2006, described above. Furthermore, Dr. Raza
explained the discrepancy between the GAF score of 65 and the severe conditions that he
indicated by describing the unpredictable nature of bipolar disorder, which includes manic
and depressive phases as well as periods of normalcy. (Tr. 360.) Defendant argues that
Dr. Raza's notes indicated no episodes of lower GAF scores during the relevant period.

However, plaintiff received GAF scores of 20, 50, and 55 from other medical professionals a few months prior to her original application date, July 24, 2006. (Tr. 164, 179, 252.)  Further, Dr. Raza noted that her lowest GAF scores during the previous years were in the 50s.  (Tr. 329, 358.)  Dr. Raza's explanation is also consistent with his observations that, at times, plaintiff appeared alert, oriented, coherent, relevant, and rational.  Dr. Raza's observations also included snappiness, irritability, hearing voices, difficulty sleeping, crying, hyperactivity, and inappropriate laughter, mood, and affect. (Tr. 308-09, 334, 345, 597, 599, 600.)

Dr. Raza further found drug use to be consistent with bipolar disorder, explaining that bipolar individuals often self-medicate their symptoms with illicit substances and that abstaining from drug use would not significantly improve her condition.  (Tr. 359-60.) Moreover, plaintiff reported symptoms relating to her mental condition at times when the record did not indicate drug use.  (Tr. 345, 600.)  Although plaintiff did not strictly comply with her treatment regimen, she did so due to lack of transportation or unpleasant side effects.  (Tr. 333, 345, 599); see Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("failure to follow a prescribed course of treatment *without good reason* can be a ground for denying an application for benefits.") (emphasis added).  Moreover, "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse."  Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009).  Further, Dr. Raza noted that even compliance with treatment could not control the unpredictable nature of bipolar disorder.  (Tr. 359.)  Dr. Raza provided no clinical tests or findings but explained that such tests are not conducive to psychiatric diagnoses and that he based his findings on personal observation.  (Tr. 360.)  Defendant notes several occasions when plaintiff's symptoms alleviated after treatment compliance but fails to recognize plaintiff's complaints regarding her symptoms even in the absence of treatment compliance concerns.  (Tr. 351, 597, 606.)

An ALJ may afford little weight to an opinion in the format of a check-off form without support from clinical tests, findings, or significant limitations in the treatment notes. Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011). Dr. Raza did not expressly frame his concerns as significant limitations, but the Commissioner concedes that his treatment note observations indicated significant functional limitations. (Doc. 24 at 12.) Although the Commissioner notes that plaintiff denied a history of hallucinations or delusions to Dr. Reising, the undersigned finds this single discrepancy does not constitute substantial evidence sufficient to discount Dr. Raza's opinions. (Tr. 608.)

The ALJ also discredited Dr. Raza's opinion, because "he backdated his assessment to the claimant's teen years even though he had not treated her at the time." (Tr. 379.) Specifically, the form medical opinion states, "Based upon your evaluation, treatment, and/or review of records, please state the earliest date from which the limitations assessed on this form have existed at the assessed severity." (Tr. 357.) Dr. Raza responded, "Since her teen years." (Id.) Although he did not treat her during her teen years, his records indicate that she attempted suicide at age 17. (Tr. 303.) Other medical records confirm that plaintiff suffered symptoms during her teenage years. (Tr. 164-65.)

As a specialist, Dr. Raza provided regular treatment for plaintiff's mental conditions for nearly six years. The ALJ pointed to no other medical evidence that contradicted Dr. Raza's opinion. See Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000) ("It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record."). Although the treating physician's opinion arguably consisted of conclusory statements, Dr. Raza also supplemented his opinion, explaining his findings and rectifying apparent discrepancies. See Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists *only* of conclusory statements.") (emphasis added). Moreover, particularly in consideration of Dr. Raza's explanation, his treatment notes support or at least are not

inconsistent with his opinion.  <u>See</u> <u>Davidson</u>, 578 F.3d at 843.  The ALJ pointed to no other opinion better supported by the record, and Dr. Raza did not render inconsistent opinions.  <u>See</u> <u>Prosch</u>, 201 F.3d at 1013.  Accordingly, substantial evidence does not support the ALJ's decision to afford Dr. Raza less than controlling weight.

Because the ALJ's decision regarding the weight afforded to plaintiff's treating physician is not supported by substantial evidence, the undersigned recommends the action be remanded to the Commissioner for reconsideration.  On remand, the Commissioner should be ordered to consider controlling all of Dr. Raza's findings and opinions, including the unpredictable nature of bipolar disorder.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded for further proceedings under Sentence 4 of 42 U.S.C. § 405(g).  On remand, the Commissioner should be ordered to consider controlling all of Dr. Raza's findings and opinions, including the unpredictable nature of bipolar disorder.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

     /S/  David D. Noce       
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 20, 2013.